FILED

03/18/2022

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 1, 2021

**IN RE JAYCE D., ET AL.**

**Appeal from the Juvenile Court for Overton County**
**No. 20-JV-68          Daryl A. Colson, Judge**
_____

**No. M2021-00539-COA-R3-PT**
_____

This appeal involves a petition to terminate parental rights. The juvenile court found by clear and convincing evidence that seven grounds for termination as to the mother were proven: (1) abandonment by failure to visit; (2) abandonment by an incarcerated parent for failure to support; (3) abandonment by an incarcerated parent for wanton disregard; (4) abandonment by failure to establish a suitable home; (5) substantial noncompliance with a permanency plan; (6) persistent conditions; and (7) failure to manifest an ability and willingness to assume custody. Additionally, the juvenile court found that termination of Mother's parental rights was in the best interests of the children. The mother appeals. On appeal, the Department of Children's Services does not defend the ground of abandonment by failure to visit. We reverse the juvenile court in part and affirm in part, affirming the ultimate termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part and Affirmed in Part**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Kelly R. Williams, Livingston, Tennessee, for the appellant, Tanya L. E.

Herbert H. Slatery, III, Attorney General and Reporter, and Lexie A. Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.          **FACTS & PROCEDURAL HISTORY**

Tanya L. E. ("Mother") is the mother to two children: Jayce and Jordan.[1]  In October 2018, the Tennessee Department of Children's Services ("DCS") became involved with this family after receiving a report of harm concerning the children.  DCS was unable to complete its investigation due to the evasive actions of Mother and her paramour.  As a result, the juvenile court entered an ex parte order allowing DCS to complete its investigation.  According to reports from an acquaintance of the family, the paramour called her during this time and asked if the family could come to her home to take a shower.  After arriving at her home around midnight, the acquaintance reported that Mother appeared "high" and her paramour was "so high he could not even talk."  Additionally, the acquaintance observed that the children, ages four and three, were "dirty" and "skinny."  The acquaintance reported that the paramour called the following day and asked if the family could move into her home, which the acquaintance did not allow.  Afterward, the acquaintance reported that her neighbor witnessed the paramour bust the windshield out of her car.  Another acquaintance reported that the family had been living with her, but she kicked them out after the paramour threatened her.

After Mother and her paramour failed to comply with the ex parte order, the juvenile court entered an attachment pro corpus and a protective custody order finding that there was probable cause to believe that the children were dependent and neglected, and immediately placing the children in the protective custody of DCS.[2]  The order also restrained Mother and her paramour from contact with the children, their school, and their residence once the children were located and removed from her care.  During that time, a child protective services investigator ("CPSI") began looking for the children, which led to a child endangerment alert being issued.  When Mother and the children were located, Mother was arrested for child endangerment.  Mother submitted to a drug screen at the jail and tested positive for methamphetamine, amphetamine, and marijuana.  The CPSI reported that the children informed her that they had been sleeping in a vehicle.  The CPSI also reported that the children were wearing dirty clothes, smelled as though they had not bathed in quite some time, and Jayce appeared to be malnourished.  Thereafter, the children entered DCS custody and were placed in relative foster care with their maternal great aunt on October 18, 2018.  On October 23, 2018, DCS filed a petition to declare the children dependent and neglected, and for emergency temporary legal custody.  Ms. Tiffany Lawson became involved with the family at this time as the DCS case manager.

In November 2018, DCS filed petitions to set support for the children.  The initial permanency plan was developed in November 2018 and ratified in January 2019.  The responsibilities relevant to Mother are summarized as follows:

---

[1] At the outset, we note that Jeremiah M. D. ("Father") is the father of Jayce and Jordan and that the juvenile court terminated his parental rights on four grounds.  However, Father did not appeal the termination of his parental rights.  Therefore, we focus on the facts pertinent to Mother in this case.

[2] The juvenile court later entered an amended protective custody order to reflect the correct spelling of the children's names, remove the paramour as a party, and add Father as a party.

1. Submit to random drug screens, only test positive for prescribed medications, inform DCS of prescriptions, and provide medications for pill counts;
2. Complete an alcohol and drug ("A&D") assessment and a mental health assessment with a parenting component, provide an honest and truthful report during those assessments, and follow recommendations;
3. Sign releases of information to allow DCS to correspond with providers, communicate with law enforcement and probation officers, and obtain medical and educational records for the children;
4. Obtain a legal source of income, provide proof of that legal income, and complete a budget;
5. Demonstrate knowledge of community resources;
6. Obtain safe and suitable housing, provide proof of payment on rent and utilities, submit to announced and unannounced home visits, and report all persons in the home and any changes in her living arrangements within 48 hours;
7. Attend court hearings, pay all court costs and fines, and comply with any rules of probation or court orders;
8. Settle all legal charges, refrain from acquiring new charges, dissociate with anyone known to be involved in criminal activity, report any new charges within 48 hours, and provide information regarding the new charge and where it occurred;
9. Maintain weekly contact with Ms. Lawson and provide updates on progress toward actions steps; and
10. Provide for the children during visitations and provide 24-hour notice if needing to cancel or reschedule a visit with the children.

Mother signed the DCS form setting forth the criteria and procedures for termination of parental rights. Ms. Lawson also filed an affidavit verifying that she reviewed the initial permanency plan and the DCS form setting forth the criteria and procedures for termination of parental rights with Mother.

In January 2019, Mother failed a drug screen testing positive for methamphetamine. Mother informed Ms. Lawson that she completed her initial A&D assessment with Hiwassee, but did not immediately provide confirmation of the assessment. During this time, the maternal great aunt informed Ms. Lawson that she no longer wanted to be a placement for the children because it was placing too much stress on the family. As a result, Ms. Lawson contacted Mother's brother, the children's maternal uncle, who resided in New Jersey and stated that he wanted to serve as a placement for the children. In the meantime, the children were transferred from their maternal great aunt's care and placed in the care of non-relative foster parents in February 2019. Mother was also charged with fraudulent use of a credit card in February 2019, but according to Mother the charges were eventually dropped. In March 2019, Mother failed drug screens testing positive for amphetamine and methamphetamine. In April 2019, Mother completed a second A&D assessment with Health Connect after being ordered to complete a new one and tested positive for methamphetamine at the assessment. On April 3, 2019, the juvenile court

entered an order finding that DCS had proven by clear and convincing evidence that the children were dependent and neglected based on the Mother's conduct, behavior, and continued use of methamphetamine.

The second permanency plan was developed in April 2019 and ratified in July 2019. According to the plan, Mother was required to complete a new mental health assessment. Other than that change, Mother's responsibilities remained virtually the same, but the permanency plan provided updates on many of her action steps. The permanency plan noted that the juvenile court ordered Mother to complete a second A&D assessment, she completed that assessment, and she tested positive for methamphetamine at the assessment. Mother provided a bill of sale for a new home, but it was in her mother's name. Therefore, Mother was currently residing with the maternal grandmother and still needed to obtain housing for herself and the children. The permanency plan also noted that Mother missed two scheduled calls with the children and had been late on previous calls with them. Mother was 45 minutes late for one visit and had to be reminded on several occasions to not discuss inappropriate topics with the children.

In April 2019, there were several incidents that led to the juvenile court issuing a restraining order against Mother and the maternal grandmother. Ms. Lawson received a call from Jayce's school advising her that Mother and the maternal grandmother came to the school, caused a scene, and then circled the parking lot calling out to Jayce on the playground until a teacher had to bring him inside. The following day, Ms. Lawson received a call from the foster mother, who advised her that Mother and the maternal grandmother were seen outside the foster parents' residence. Mother and the maternal grandmother were also observed at Jayce's school again. Ms. Lawson received another call from the foster mother, who advised her that the maternal grandmother was observed at the foster parents' residence again and had followed the foster mother en route to Jayce's school. Furthermore, someone had left notes on the foster parents' vehicles regarding the children. As a result of these incidents, DCS filed an ex parte petition for a restraining order against both Mother and the maternal grandmother, which was granted.

Despite the ex parte restraining order, the maternal grandmother continued her efforts to make contact with the children. An officer responded to a call for a welfare check on the children at the foster parents' residence and found the maternal grandmother in the apartment parking lot expressing concern for the children. The officer found nothing of concern in the foster parents' residence and advised the maternal grandmother to leave the property or she would be charged accordingly. A week later, the police had to be called after the maternal grandmother came to the DCS office knocking on the windows and demanding to speak with Ms. Lawson.

At the end of April 2019, the maternal grandmother was found outside the foster parents' residence again, this time in a different vehicle and with her appearance altered. The maternal grandmother confronted the foster mother as she was attempting to place the

children into the vehicle to take them to school. The maternal grandmother grabbed the foster mother by the wrist, attempted to block her from entering the vehicle, and law enforcement was contacted. In May 2019, the maternal grandmother was arrested outside the foster parents' residence driving a rented truck, which contained two new car seats and new clothing sized appropriately for the children. As a result, the maternal grandmother was incarcerated for aggravated criminal trespass and resisting arrest. Thereafter, the juvenile court entered a restraining order as to Mother and the maternal grandmother limiting Mother's contact with the children to visitation supervised by DCS or an approved third party and found that their behavior constituted harassment, stalking, and a violation of a valid restraining order.

In July 2019, Mother completed her psychological evaluation after arriving over an hour-and-a-half late for the scheduled appointment. During the evaluation, Mother stated that she was a victim of domestic violence and Jayce had witnessed the violence. She reported that she was still living with the maternal grandmother at this point, although she was aware she was not supposed to be living with her. She also reported that she occasionally cleaned houses, but it was difficult to obtain employment because of the charges against her. The evaluation's summary stated that Mother had significant levels of depression and anxiety, but she appeared mentally capable of providing safe parenting for the children if she made better choices in her health and environment in which she surrounded herself. The evaluation recommended that Mother received individual counseling, family counseling, and parenting education. The evaluation also recommended that "initial, intermittent visits would be beneficial to provide a watch over the children" for safety reasons if the children were returned to the home. During this time, the children were transferred from their non-relative foster parents' care and placed in their maternal uncle's care in New Jersey. At the end of July, Mother was arrested along with two convicted felons and charged with criminal trespass.[3] In August 2019, the juvenile court ordered Mother to pay child support in the amount of $151 per month per child.

In October 2019, the juvenile court entered an annual permanency plan order finding that Mother was not in substantial compliance because she had failed to maintain contact with Ms. Lawson, follow the recommendations of her second A&D assessment, and refrain from acquiring new charges. The third permanency plan was developed in November 2019 and ratified in December 2019. The order ratifying the permanency plan noted that Mother did not participate in the development of the plan and her whereabouts were unknown. Mother's responsibilities remained virtually the same, but the permanency plan required Mother to obtain a third A&D assessment because she did not follow the recommendations from her previous assessment. Thereafter, DCS filed petitions for contempt against Mother for failing to pay child support. In December 2019, the juvenile court entered show cause orders regarding Mother's criminal contempt charges for failure to pay child support. In

---

[3] Mother was found guilty of criminal trespass in December 2019. In January 2020, Mother violated her probation by failing to properly conduct herself.

February 2020, after a referral of physical abuse, the children were transported back to Tennessee from their maternal uncle's care in New Jersey and returned to their non-relative foster parents' care.

In April 2020, Ms. Lawson filed an affidavit of reasonable efforts which briefly outlined a timeline of events from October 2018 to March 2020. In May 2020, Mother was arrested and charged with possession of a schedule II substance and possession of drug paraphernalia.[4] She was incarcerated until June 8, 2020. Mother admitted that she had been injecting methamphetamine for the past two weeks and was in possession of hypodermic needles that contained methamphetamine. In June 2020, Ms. Lawson filed an affidavit verifying that she reviewed the third permanency plan and the DCS form setting forth the criteria and procedures for termination of parental rights with Mother.

On July 9, 2020, DCS filed a petition to terminate the parental rights of both Father and Mother. DCS alleged the following grounds against Mother: (1) abandonment by an incarcerated parent for failure to support; (2) abandonment by an incarcerated parent for wanton disregard; (3) abandonment by failure to establish a suitable home; (4) substantial noncompliance with a permanency plan; (5) persistent conditions; and (6) failure to manifest an ability and willingness to assume custody. DCS also alleged that termination of Mother's parental rights was in the children's best interests. After a delay due to COVID-19, the juvenile court held a trial on the petition on April 7, 2021.

Ms. Lawson was the DCS case manager involved with this family since October 2018 and testified that her purpose was to work with Mother and the children in order to achieve reunification.[5] She stated that the children came into DCS custody after Mother was arrested for child endangerment. Afterward, Mother tested positive for methamphetamine, and the children disclosed that they had been living in a vehicle. While Mother was incarcerated, Ms. Lawson and Mother were able to discuss the steps which the permanency plan stated she would need to take in order to achieve reunification. They specifically discussed the importance of the following action steps: complete an A&D assessment; submit to drug screens in order to prove sobriety; obtain appropriate housing; and refrain from acquiring new charges.

Throughout her testimony, Ms. Lawson described Mother's overall demeanor as "defensive" and "argumentative," and stated that Mother blamed DCS and others for taking the children from her. She also testified that she had problems maintaining contact with Mother and that contact with Mother was "in and out." She stated that Mother demonstrated a pattern of contacting her right before court. This was a problem because DCS wanted Mother to show participation and consistency, and DCS could not verify her

---

[4] Following her arrest, Mother was found guilty of possession of drug paraphernalia.

[5] Although Ms. Lawson refers to both Father and Mother throughout portions of her testimony, we only reference her testimony as it concerns Mother.

progress when she failed to maintain contact. Ultimately, Ms. Lawson believed that Mother was not substantially compliant with the permanency plan. She stated that there were three permanency plans created throughout this case, but the plans had the same steps and nothing had changed since she took over the case in October 2018.

Ms. Lawson explained that the most important action step throughout this case was the issue of Mother's substance abuse. In order for her to address her substance abuse, Mother was required to complete specific assessments, follow recommendations from those assessments, and pass her drug screens. After Mother's release from incarceration in November 2018, Ms. Lawson asked her to submit to a hair follicle drug screen, but Mother failed to appear for two appointments scheduled in December 2018. Mother also did not immediately submit to her initial A&D assessment. She explained that Mother was aware of the requirement and had Health Connect's contact information, but Mother failed to complete her initial A&D assessment at that time. She testified that Mother ultimately completed an A&D assessment with Hiwassee in January 2019, but did not provide confirmation until later. Afterward, Mother tested positive for methamphetamine in January 2019 and acquired new criminal charges for fraudulent use of a credit card in February 2019. Mother was ordered by the juvenile court to submit to a drug screen in March 2019. Ms. Lawson stated that two drug screens were conducted as a result and Mother tested positive for amphetamine and methamphetamine on both drug screens. The juvenile court also ordered Mother to submit to another A&D assessment and advised her to meet with a Health Connect worker to schedule that appointment. However, Mother failed to meet with the worker even after Ms. Lawson encouraged her to do so and confirmed that she had transportation. Ms. Lawson explained that she actually called Mother, wrote out all of the contact information for Health Connect, and asked Mother to come by the DCS office. She stated that Mother eventually submitted to this second A&D assessment in April 2019, just before returning to court. The A&D assessment recommended that Mother participate in an intensive outpatient program ("IOP"). Additionally, Mother tested positive for methamphetamine at the assessment. Ms. Lawson explained that she discussed the IOP recommendation with Mother several times to ensure that Mother understood that participation was necessary but that Mother continued to fail drug screens.

Ms. Lawson explained that addressing mental health and obtaining suitable housing were important action steps as well. In regard to mental health, Ms. Lawson stated that Mother had told her on two occasions that this case had caused her to have mental health issues and that she was going to seek treatment. Thus, she advised Mother on the different providers to reach out to for mental health treatment. Ms. Lawson scheduled a psychological evaluation in March 2019, but Mother failed to appear for this appointment and it was rescheduled. She scheduled a second psychological evaluation in April 2019, but Mother failed to appear for that appointment after Ms. Lawson had confirmed it with her. The provider then canceled the missed appointment and informed Ms. Lawson that it would be June 2019 before another appointment could be scheduled. Mother then

participated in part of her psychological evaluation in June 2019, but the provider was unable to complete it because Mother had arrived late for the appointment. Mother eventually completed the psychological evaluation in July 2019.

In regard to housing, Ms. Lawson testified that Mother was either living with the maternal grandmother or moving around from place to place after the children were removed. At the time, she was unsure if Mother had an actual residence and explained that there was concern about Mother living with her paramour. She also explained that Mother had a difficult relationship with Father that involved issues of domestic violence and substance abuse. Mother had disclosed that he had physically assaulted her when she allowed him to stay with her after his release from incarceration. Ms. Lawson stated that Mother asked that the maternal grandmother be looked at as a placement for the children. However, she explained that the maternal grandmother had been ruled out as a placement for the children because the maternal grandmother had charges against her for harboring Mother. For this reason, she stated that the maternal grandmother's home would not be a place where Mother could live and successfully reunite with the children, but Mother intended to reside with the maternal grandmother upon being released from her incarceration in November 2018. In April 2019, Mother was still living with the maternal grandmother, so Ms. Lawson reminded her that this housing situation was not appropriate.

In regard to visitation, Ms. Lawson testified that she supervised calls between Mother and the children and that those calls "did not go very well." She stated that there were several instances where she had to stop her from talking about the case or redirect her from discussing inappropriate topics with the children. She described one particular call that occurred in February 2019, in which Mother called in ten minutes late. She stated that Jayce had gotten in trouble during that time and was put in time-out. When she called in, Mother was upset that both children were not on the call, but Jayce returned to the call before it was over. However, Mother continued to speak to Jordan when Jayce would speak and appeared to be unable to distinguish between the children's voices. Ms. Lawson explained that there was a distinct difference between the children's voices and believed Mother's inability to recognize her own son's voice to be a red flag. She also testified that she supervised a call with Mother in May 2019, during which she had to interrupt Mother three times because she continued to discuss inappropriate topics with the children.

Ms. Lawson also explained that Mother's tardiness for visitation and calls was an issue. In addition to frequently missing scheduled visits and calls, she stated that Mother arrived late or called in late for approximately 75% of them. She described a particular visit in June 2019, in which Mother was two-and-a-half hours late. When she arrived late for visits, Mother had "a list of different excuses," but usually blamed her tardiness on transportation issues. Ms. Lawson had explained to Mother that DCS could assist with transportation, provide gas cards, and help set up use of her area's public transportation service. She stated that Mother missing and arriving late for visits had an effect on the children and upset them. Despite having a previous conversation about what topics should

not be discussed with the children, Ms. Lawson stated that Mother continued to behave inappropriately during those visits. She explained that Mother told the children "that the bad people had taken the children away from her and then made her sad, and would refer to the things that were going on [were] caused by the bad people . . . ." Mother's last visit with the children was in June 2019 due to an extension of the restraining order, which was not amended to include supervised visitation.

Ms. Lawson testified that she began having serious issues with Mother's behavior in April 2019, which involved Mother and the maternal grandmother stalking and attempting to take the children. Initially, they appeared at the school, demanded to see Jayce, and were causing problems. Afterward, Ms. Lawson advised Mother that they were not to be on school property and explained to Mother that she was not to see Jayce without DCS supervision. Over the next couple of days, Mother continued driving by the school. Ms. Lawson and the school resource officer ("SRO") contacted Mother, went over the restraining order that accompanied the initial custody order, and advised Mother that she should not return to the school property. Ms. Lawson stated that Mother seemed to understand. During that call, she also requested a drug screen since Mother was in the area, but Mother refused. Thereafter, the foster parents continued to report concerns about Mother and at one point the maternal grandmother physically attempted to take the children from the foster parents. This behavior by Mother and the maternal grandmother ultimately resulted in a restraining order issued by the juvenile court.

By the end of April, Ms. Lawson stated, Mother had failed to start her IOP, obtain appropriate housing, participate in any parenting education, or submit to a psychological evaluation. In May 2019, she scheduled a nail bed test for Mother and notified Mother in advance to ensure there were no transportation issues, yet Mother failed to appear for the test. Ms. Lawson emphasized that this was the third nail bed test or hair follicle drug screen for which DCS paid but Mother failed to appear. She stated that her overall contact with Mother around this time was minimal. However, when the children were placed with their maternal uncle in July 2019, Mother called and was argumentative and upset that she did not get to tell them goodbye. Afterward, Mother's contact was "sporadic." Ms. Lawson explained that most of the contact she had with Mother during this time was through the maternal uncle and that Mother did not keep in contact or inform DCS of any participation in services. She reiterated that the permanency plan required Mother to maintain weekly contact with her, but at this point Ms. Lawson did not even know where Mother was living. At the end of July 2019, she learned that Mother had acquired new charges for criminal trespass.

Ms. Lawson stated that the foster parents became concerned about Mother's behavior again in August 2019. Mother would miss the scheduled calls with the children and then would call late at night after the children were in bed. On one occasion, the foster parents stated that they had concerns about Mother's mental state, and Ms. Lawson contacted the sheriff's department in order to obtain a welfare check on her. However,

they were unable to make contact with Mother. At this point, she explained that she still did not know where Mother was living, her only contact with Mother was through the maternal uncle, and even the maternal uncle became concerned about Mother's wellbeing. Mother had still failed to start her IOP or any mental health treatment at this point, and there were now additional concerns that her mental health was deteriorating.

Although Mother had Ms. Lawson's contact information, Ms. Lawson testified that she did not hear from Mother again until seven months later in March 2020. She stated that she had obtained Mother's contact information from the maternal uncle, but was unable to make contact with her. New Jersey law enforcement reported that Mother had tried to make contact with the children there. Therefore, Ms. Lawson sent copies of the restraining orders to law enforcement in New Jersey. During this time, she conducted a regular diligent search for Mother and discovered that Mother had been incarcerated in December 2019 for failure to appear in court for her criminal trespass charge. She was unable to make contact with Mother at the jail because Mother was released the same day of her arrest.

Ms. Lawson testified that the children returned to Tennessee in February 2020. Afterward, Ms. Lawson finally heard from Mother again because Mother was upset about not being notified about the move. During this call, Ms. Lawson informed Mother about the upcoming court date and CFTM, and was able to obtain Mother's new address. However, Mother failed to participate in the CFTM. Around this time, Ms. Lawson began to see a need for services for the children. She explained that the children were confused, upset, and afraid to be around her because they believed that she might take them or move them again. Furthermore, there was a tornado that had come through the area in March 2020, which was a traumatic experience for the children. She referred them for services with Health Connect and set up comprehensive child and family treatment for them. She explained that this would have been a good opportunity for Mother to learn about the children, but Mother failed to participate in the CFTM in order for it to be discussed with her.

When she heard from Mother again in March 2020, Ms. Lawson attempted to discuss the permanency plan with her, but Mother became argumentative and defensive stating that DCS had taken the children away from her. She advised Mother that they could go over the permanency plan and offered to meet with Mother the following day with hopes of obtaining a drug screen. She also stated that she was unable to verify the residence that Mother had previously provided to her. Additionally, she checked Mother's old address and no one was living there, so she had no proof of residence at that time.

At this point, Ms. Lawson testified that the children had been in custody for approximately a year-and-a-half and there was no progress on the permanency plan. She explained that Mother was not coming to court, there were no recent drug screens, there was no proof of an IOP or that Mother was attempting the counseling recommendation

- 10 -

from her psychological evaluation. Furthermore, Mother had neither paid child support nor provided clothing or food for the children. Ms. Lawson stated that Mother did not take responsibility for the situation and continued to blame DCS or others. After her attempt to verify Mother's address, she asked Mother for another address, but Mother did not give her one. During another conversation, Mother told Ms. Lawson she was staying in Tellico Plains with her uncle, but Mother was unable to provide the actual address. When Ms. Lawson explained to Mother that it would be difficult to visit the home without an address, Mother became frustrated and hung up. Before Mother hung up, Ms. Lawson reminded her that the IOP and counseling were necessary requirements that she still needed to complete. Ms. Lawson stated that Mother also informed her that she was employed, but would not provide any further information and was not paying any child support at the time.

Ms. Lawson testified that in April 2020 Mother exhibited behavior that was another "big red flag." She explained that Mother called "very upset" and left a message threatening to "come hunt the kids down like she had before." However, she stated that Mother called back later that same day and apologized for her behavior. She stated that she and Mother then reviewed all of the services, housing, and how to obtain a post office box in order to receive mail from DCS. She also asked Mother to submit to a drug screen. However, Mother disputed the need for all of the recommendations that DCS had given her. At this point, Mother had still failed to complete an IOP, had failed to start counseling, and was now denying that she even needed to participate in an IOP. She informed Mother of the upcoming CFTM in May 2020, and Mother actually participated in that CFTM. She stated that during that CFTM, they reviewed the permanency plan and went over everything that Mother still needed to do. However, Mother again denied that she needed the recommended services. Mother then acquired new charges on May 24, 2020 for possession of a schedule II substance and possession of drug paraphernalia. While incarcerated, Mother was drug screened and tested positive for amphetamine. Ms. Lawson stated that Mother was incarcerated until June 8, 2020, and that Mother called the following day to inform her that she had been released. At this point, she stated that she was still unaware if Mother had started her IOP or counseling.

At the time of the filing of the petition for termination, Ms. Lawson stated that Mother had failed to complete the following requirements: complete an IOP; complete individual counseling; maintain weekly contact with DCS; participate in appropriate visitation and calls with the children; pay child support; and demonstrate substantial sobriety. She stated that the last CFTM was held in February 2021. At that time, Mother was to maintain her employment, provide check stubs, provide proof of housing, and submit to drug screens. At trial in April 2021, Mother provided check stubs, a lease agreement, electricity bills, and parenting certificate. Additionally, Mother had become employed as a forklift operator making $25 per hour. Ms. Lawson admitted that Mother had started to do some things, but she was unable to verify that Mother was doing all of these things or able to maintain them. She also stated that Mother provided proof of

insurance on the children and that child support was garnished from her check, but that these things were done after the petition was filed.

Due to delays associated with COVID-19, the trial was continued until April 2021. Mother had been living in Illinois since October 2020, which created a barrier for DCS to be able to do drug screens. Ms. Lawson explained that DCS still needed to see that Mother was maintaining sobriety, submitting to drug screens, and participating in an IOP in order to prove that she was sober. She asked Mother to complete drug screens in Illinois, but Mother had not submitted any of those to Ms. Lawson. On the day of the termination hearing, Mother asked to be drug screened. Ms. Lawson explained that she did not screen Mother because she was aware of the court appearance, and therefore it would not have been an unknown drug screen. Ms. Lawson had requested a hair follicle drug screen two weeks prior, but Mother refused. She testified that as of the date of trial, which was nine months after the filing of the petition, she did not have any proof of Mother's sobriety.

Ms. Lawson testified that Mother had not paid any child support prior to the filing of the petition for termination in July 2020, and had not provided any justifiable excuse for being unable to support the children. After the petition was filed, child support was garnished from Mother's check. Ms. Lawson testified that Mother's substance abuse, specifically her continued use of methamphetamine, was what led to her arrest in May 2020. She explained that Mother had not attempted to complete any of the services to address her substance abuse at that point, continued to not follow up with those, and her substance abuse would put the children in danger. Moreover, she stated that Mother obtaining criminal charges created a barrier for the children to be able return to Mother's home and that Mother still did not have a suitable home at the time of the filing of the petition in July 2020.

Ms. Lawson detailed the efforts that she made to assist Mother. She went over the permanency plan requirements with Mother. She also scheduled appointments for hair follicle drug screens in December 2019, but Mother failed to appear for them. Additionally, in July 2020, Mother still had not obtained a suitable home that Ms. Lawson could inspect. Ms. Lawson stated that Mother had provided a lease agreement for her current home in Illinois at the time of trial, but she had not been able to verify the suitability of that home. She testified that the children were now connected and bonded with their foster parents. They did not ask about Mother and referred to their foster parents as their parents. Ms. Lawson explained that the children were upset in the beginning, but whatever connection that they did have with Mother had dwindled because of her actions.

Ms. Lawson was concerned about the physical environment of Mother's home at the time the petition was filed because DCS did not know or have verification of where she was. She discovered Mother was living in Illinois in January 2021, but Mother did not disclose who she was living with at the time and that a background check would need to be performed on any persons residing with Mother. Additionally, the permanency plan

required Mother to report a change in residence or makeup of the home within 48 hours in order to verify the home's suitability.

Ms. Lawson stated that Mother provided copies of employment documents, her lease agreement, and a budget at trial. Mother also claimed that she was now participating in telephonic counseling through Telehealth. However, Ms. Lawson was concerned because there was no ability for the counselor to administer drug screens to verify that Mother was sober, stable, and in a safe environment and that this counseling did not demonstrate an adjustment of circumstances on sobriety. She also stated that Mother failed to provide proof of sobriety to demonstrate she had overcome her addiction and proof that her mental health had reached a form of stability to make it safe for the children to be in her home. Additionally, she testified that Mother had demonstrated a pattern of criminal activity in her lifestyle because of her multiple arrests. She added that Mother had not maintained any sort of regular visitation with the children. She explained that the children were bonded with their foster parents, had been with their foster parents for more than a year-and-a-half, and that their foster parents were willing to adopt them.

Although Ms. Lawson believed that Mother did love her children, she explained that Mother did not make the effort in this two-and-a-half-year period to demonstrate that love. DCS's goal was for Mother to be employed, obtain housing, pay her bills, obtain her parenting certificate, attend counseling, and be drug free. Yet, Ms. Lawson stated that DCS could not verify if Mother was drug free and if her home was suitable. Moreover, many of the steps taken by Mother occurred after the filing of the petition.

Ms. Elisa Allen provided testimony as the counselor for the children. In September 2020, she began seeing the children weekly for behavioral issues, but was seeing them monthly at the time of trial. She explained that "[t]heir behaviors have all but stopped, which is common once we get treatment for the underlying trauma that causes behaviors in children. And they are doing very well. Their attachment issues have resolved themselves."

Ms. Allen stated that the children initially struggled with destructive behaviors and hyperactivity, which were symptoms of trauma and attachment due to their lack of understanding of how to interact with adults. Therefore, she began trauma work by identifying when exactly the children had experienced trauma in their life. The children recently had spoken about being left in their room for long periods of time, being hungry, watching their parents fight, and feeling very lonely and like they were going to have to stay in their room forever. She attributed this recent discussion to the children becoming more comfortable with discussing these things with her.

Ms. Allen testified that there was currently no evidence demonstrating that the children were attached to Mother, but that they were attached to their foster parents. She described the children's behavior during discussion about Mother as "very flat," explaining

that "there's really nothing there" and the children "kind of go blank." Moreover, she stated that the children seem happy and stable in their current environment. She explained that changing current caregivers would retraumatize the children again, break all attachments that they had formed, and cause acting out behaviors to reoccur. As such, she concluded that the best avenue for the wellbeing of the children would be to obtain permanency through adoption.

The foster mother testified that the children had been in their home for two separate episodes for a total of 20 months. The children were in their care for six months before being placed in their maternal uncle's care in New Jersey and then subsequently returned to their care. She stated that the children had chosen to call them "Mom" and "Dad." After asking the children's counselor, she was told to encourage this because the children would feel the safeness, stability, and comfort of knowing that the foster parents were going to be there for them. She also stated that her and her husband met with the counselor to learn parenting techniques and how to address the children's concerns, instabilities, and fears which help the children feel safe and stable.

The foster mother testified that the children kept their feelings inside when they first came to them. As time passed, the children began to report details of abuse and neglect from their time with Mother. Jayce had disclosed that there were times when they did not have food to eat or things that they needed. Jordan had disclosed details about the volatile nature of Mother's and Father's relationship stating that there was a lot of fighting and arguing and that he was fearful. The foster mother testified that the children were both progressing in counseling, doing well in school, and excelling educationally. She also stated that the children had not asked about Mother in the past year. She explained that the children expressed enjoyment when Mother would bring them gifts, but she never saw the children express any love for Mother. The foster mother described the children as being "very bummed" after a visit where Mother arrived late.

The foster mother testified that there were times when she was afraid or fearful of Mother during this case, especially during the first period when they had the children. For approximately four to six weeks, Mother and the maternal grandmother were coming to their house, sitting outside, and watching them, which led to the restraining order. Because of this behavior, the foster parents also became concerned about the terms of their lease being violated. Mother and the maternal grandmother had gone so far as to go to the landlord and pretend to want to rent an apartment, which caused stress to the neighbors. Despite all of this, she stated that she and her husband "love the boys unconditionally, no matter what, and so we will push through whatever we need to push through." She and her husband were willing to adopt the children.

Mother testified that it was her understanding that the children were removed from her care because she did not have appropriate housing and she tested positive for methamphetamine. Mother admitted to her wrongs and was remorseful during her

- 14 -

testimony. She believed that moving out of state had helped her and admitted that the maternal grandmother negatively affected her efforts in this case. At the time of trial, Mother resided in Illinois and had moved there because she wanted to escape the lifestyle she had been "wrapped up in" while living in Tennessee. She explained that she was now employed as a forklift operator making $25 per hour and had rented a place of her own since February 2021. At the time of trial, she provided copies of her forklift certification, check stubs, wage rate, photographs of her home, insurance, and budget. She testified that she had sufficient income to care for the children. She stated that she was currently receiving counseling telephonically. She also stated that she had completed her psychological evaluation and her parenting education, had a valid driver's license, and had paid off her vehicle. She testified that she went to visitation in the past when she could, but admitted she had a problem being late because of her substance abuse. She stated that child support had been garnished out of her paycheck, her tax return, and her stimulus checks. However, she explained that she did not pay child support in the past because she did not have a job, did not have transportation, and "things were really hard."

Mother testified that she was not using drugs at the time of trial, had to stay clean in order to keep her job, and had been clean since May 2020. As such, she stated that she would pass a drug screen if she were given one at that time. She explained that she was scared to submit to the drug screen Ms. Lawson had requested two weeks prior because she had used "Delta-8 CBD," which she stated was not THC but would still cause her to fail for THC. She acknowledged that she understood that it was a necessary requirement on her permanency plan for her to demonstrate sobriety. She testified that she loved her children very much and believed she was competent to take care of them. She stated that her main focus was to get her children back and was willing to do anything that the court would require of her. She explained that she would drive down every week for a drug test or obtain one in Illinois if required to do so. She wanted to continue bettering herself and wanted her children in her life. She stated that she wanted her children to call her "Mom" and wanted the family that she had never had.

On April 21, 2021, the juvenile court entered an order terminating Mother's parental rights. Among other things, the juvenile court noted that Mother had "a very poor track record," "lack[ed] seriousness about this case," "would not accept responsibility for her own actions," and demonstrated "a general indifference" toward this situation. Additionally, the juvenile court noted that it was "unaware of what was going on in [M]other's life" at the time of trial. The juvenile court found by clear and convincing evidence that seven grounds for termination as to Mother were proven: (1) abandonment by failure to visit; (2) abandonment by an incarcerated parent for failure to support; (3) abandonment by an incarcerated parent for wanton disregard; (4) abandonment by failure to establish a suitable home; (5) substantial noncompliance with a permanency plan; (6) persistent conditions; and (7) failure to manifest an ability and willingness to assume custody. The juvenile court also found that termination of Mother's parental rights was in the best interests of the children. Thereafter, Mother timely filed her appeal.

- 15 -

## II.  ISSUES PRESENTED

Mother presents the following issues for review on appeal, which we have slightly restated:

1.  Whether the juvenile court erred in terminating Mother's parental rights in failing to consider that Mother had obtained stable housing; obtained a job making $25 per hour; completed her parenting education; completed a psychological evaluation; obtained her A&D assessment; completed her budget; and completed the majority of the items listed on her permanency plan;
2.  Whether the juvenile court erred in terminating Mother's parental rights in failing to consider that DCS refused to allow Mother to visit with her minor children even though the previous order filed in the juvenile court did not order Mother to be restrained from visiting her minor children;
3.  Whether the juvenile court failed to consider Mother's psychological and parenting assessment in making its decision to terminate her parental rights;
4.  Whether the juvenile court failed to consider that Mother paid child support for her children in making its decision to terminate her parental rights;
5.  Whether the juvenile court failed to consider that Mother was receiving her counseling in making its decision to terminate her parental rights; and
6.  Whether the juvenile court's ruling that the termination of Mother's parental rights was in the best interests of the minor children is supported by clear and convincing evidence.

For the following reasons, we reverse the juvenile court in part and affirm in part, but ultimately affirm the termination of parental rights.

## III.  STANDARDS APPLICABLE TO TERMINATION CASES

"A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016). "Parental rights have been described as 'far more precious than any property right.'" *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must

prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interests of the children under the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

Because of this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review the trial court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

On appeal, Mother indirectly challenges the grounds for termination by arguing that the juvenile court failed to consider several facts in making its decision to terminate her parental rights. Mother also challenged the juvenile court's determination that termination of her parental rights was in the best interests of the children. The Tennessee Supreme Court held in *In re Carrington H.* that this Court must "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. Therefore, we review each ground for termination as to Mother and whether termination was in the children's best interests.

### A. Grounds for Termination Against Mother

### 1. Abandonment by Failure to Visit

One ground for termination exists based on a parent's abandonment of his or her child. Tenn. Code Ann. § 36-1-113(g)(1). Under Tennessee Code Annotated section 36-1-

102(1)(A), there are several alternative definitions of "abandonment." *See* Tenn. Code Ann. § 36-1-102(1)(A). DCS states that it does not defend the ground of abandonment by failure to visit pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i). We therefore reverse the juvenile court's finding as to this ground. *See In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *6 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019) ("[W]hen the petitioner who sought termination has conceded on appeal that a ground was not sufficiently proven, this Court has, in several cases, reversed the trial court's finding as to that ground without reaching the merits of whether the ground was actually established."); *In re Zane W.*, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *7 (Tenn. Ct. App. July 6, 2017) *perm. app. denied* (Tenn. Sept. 26, 2017) (reversing a ground that DCS "does not defend" and noting that *In re Carrington H.* "has never been construed to require this Court to also consider the grounds sustained by the trial court and thereafter conceded or waived by the non-parent on appeal").

### 2. Abandonment by an Incarcerated Parent for Failure to Support

Another alternative definition of abandonment provided under Tennessee Code Annotated section 36-1-102(1)(A)(iv) is:

(iv) A parent . . . is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, or a parent . . . has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

(*a*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration;

(*b*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of non-incarceration immediately preceding the filing of the action; or

(*c*) Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv)(*a*)-(*c*). This Court has "indicated that the above definition 'contains multiple ways of abandonment for termination of parental rights.'" *In re Navada N.*, 498 S.W.3d 579, 598 (Tenn. Ct. App. 2016) (citing *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014)). We

have explained that incarceration is a condition precedent for this definition of abandonment:

> [A]bandonment by an incarcerated parent may only apply where the parent . . . "is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding."

*Id.* (citing Tenn. Code Ann. § 36-1-102(1)(A)(iv)). "[T]he parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct . . . ." *In re Audrey S.*, 182 S.W.3d at 866. We have further explained that while "parental incarceration is a strong indicator that there may be problems in the home that threaten the [children's] welfare," it "is not an infallible predictor of parental unfitness." *Id.*

Under this definition of abandonment, the juvenile court found that DCS met its burden in proving the ground of abandonment by an incarcerated parent both for failure to support and for wanton disregard. Mother was arrested and charged with possession of a schedule II substance and possession of drug paraphernalia on May 24, 2020, and incarcerated until June 8, 2020. The petition for termination of parental rights was filed on July 9, 2020. Thus, the condition precedent of incarceration is satisfied because Mother was incarcerated for a period during the four consecutive months immediately preceding the filing of this petition.

For the ground of abandonment by an incarcerated parent for failure to support under subsection (iv)(*a*), we review whether Mother failed to support her children for four consecutive months immediately preceding her incarceration. Tenn. Code Ann. § 36-1-102(1)(A)(iv)(*a*). In her psychological evaluation in July 2019, Mother stated that she occasionally cleaned houses at the time, but it was difficult to obtain employment because of the charges against her. In August 2019, the juvenile court ordered Mother to pay child support in the amount of $151 per month per child. After failing to pay child support for two months, the juvenile court entered show cause orders regarding Mother's criminal contempt charges for failure to pay child support. The proof shows that Mother was ordered to pay child support in August 2019 but had not made payments prior to the filing of the petition in July 2020. After the petition was filed, Mother was employed in Illinois as a forklift operator making $25 per hour. Mother testified that child support had been garnished out of her paycheck, her tax return, and her stimulus checks since then. However, she explained that she did not pay child support in the past because she did not have a job, did not have transportation, and "things were really hard."[6]

---

[6] Lack of willfulness in her failure to support is an affirmative defense provided in Tennessee Code

- 19 -

The juvenile court commended Mother for obtaining employment and hoped that she had turned her life around for the better. Likewise, we commend Mother for her efforts. However, her employment, proof of that employment, and child support payments unfortunately did not come until after the petition was filed. The proof shows that Mother failed to support her children from the time they were removed in October 2018 until the petition was filed in July 2020. This 21-month period included the four consecutive months immediately preceding her incarceration in May 2020. Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of abandonment by an incarcerated parent for failure to support.

### 3. Abandonment by an Incarcerated Parent for Wanton Disregard

For the ground of abandonment by an incarcerated parent for wanton disregard, we review whether Mother engaged in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the children. Tenn. Code Ann. § 36-1-102(1)(A)(iv)(*c*). We have explained that the determination of whether a parent engaged such conduct is not limited to the four consecutive months immediately preceding the incarceration. *See In re Audrey S.*, 182 S.W.3d at 871 ("If parental conduct which exhibits wanton disregard for the welfare of a child can constitutionally form a ground for the termination of parental rights, it would appear to be of no moment whether that conduct occurred during the four months immediately preceding the parent's incarceration or at some earlier point in time."). We have also explained the scope of wanton disregard as follows:

> "Wanton disregard" is not a defined term. Acts amounting to wanton disregard typically "reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). So "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005).

*In re Kaelyn R.*, No. E2020-01254-COA-R3-PT, 2021 WL 3878597, at *4 (Tenn. Ct. App. Aug. 31, 2021). Not only did Mother engage in criminal behavior that led to her incarceration in May 2020, but she also was arrested several other times. At the time the

---

Annotated section 36-1-102(1)(I). However, Mother did not raise this defense. Consequently, Mother waived this defense. *In re Imerald W.*, No. W2019-00490-COA-R3-PT, 2020 WL 504991, at *4 n.5 (Tenn. Ct. App. Jan. 31, 2020); *see Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 735 (Tenn. 2013) ("As a general rule, a party waives an affirmative defense if it does not include the defense in an answer or responsive pleading." (citing Tenn. R. Civ. P. 12.08)).

children were removed, Mother was arrested for child endangerment in October 2018. She was also charged with fraudulent use of a credit card in February 2019. She was arrested and charged with criminal trespass in July 2019. She was then incarcerated in December 2019 for failure to appear in court for her criminal trespass charge and violated her probation in January 2020. In May 2020, she was arrested and charged with possession of a schedule II substance and possession of paraphernalia. Furthermore, Mother engaged in behavior in April 2019 that constituted harassment, stalking, and a violation of a valid restraining order. In addition to this behavior, Mother tested positive for illegal substances on several occasions. As previously stated, Mother never made any child support payments between the time that the children were removed in October 2018 and the time of her incarceration in May 2020. We find that there is clear and convincing evidence that supports the juvenile court's finding that Mother's pre-incarceration conduct exhibited wanton disregard for the welfare of her children. Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of abandonment for wanton disregard.

### 4. Abandonment by Failure to Establish a Suitable Home

Another alternative definition of abandonment is summarized as the failure to provide a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*c*). Tennessee Code Annotated section 36-1-102(1)(A) defines abandonment for this ground as the following:

> (ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
> (*b*) The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS must make "reasonable efforts" by utilizing its superior resources to help the parent establish a suitable home. *In re Rahjada W.*, No. E2019-01798-COA-R3-PT, 2020 WL 2893434, at *5 (Tenn. Ct. App. June 3, 2020). To establish abandonment by failure to provide a suitable home, DCS must make these "reasonable efforts" during a four-month period following the removal of the child. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *In re Rahjada W.*, 2020 WL 2893434, at *5. DCS's "efforts are deemed reasonable under the statute if its efforts 'equal or exceed the efforts of the parent . . . toward the same goal.'" *In re Dominic B.*, No. E2020-01102-COA-R3-PT, 2021 WL 774185, at *6 (Tenn. Ct. App. March 1, 2021) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c)). We note that "the establishment of a suitable home entails considerations as to whether '[a]ppropriate care and attention' are given to the child at issue." *Id.* (quoting *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016)). Furthermore, "the proof necessary to support termination under this ground need not be limited to any particular four-month period after removal. As long as the proof relates to 'a period of four (4) months following the removal, . . . the ground may be established.'" *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)). Thus, our inquiry is not limited "to a period of four months *immediately* following the [child's] removal." *Id.*

Prior to the children's removal, DCS was unable to complete its investigation of a report of harm concerning the children due to the evasive actions of Mother and her paramour. As a result, on October 11, 2018, the juvenile court entered an ex parte order allowing DCS to complete its investigation. However, the juvenile court entered an attachment pro corpus and a protective custody order immediately placing the children in the protective custody of DCS after Mother and her paramour failed to comply with the ex parte order. The children were removed from Mother's custody on October 18, 2018, after she was arrested for child endangerment. Thereafter, DCS filed a petition to declare the children dependent and neglected. On April 3, 2019, the juvenile court entered an adjudicatory and dispositional hearing order finding that DCS had proven by clear and convincing evidence that the children were dependent and neglected.

Mother moved from place to place after the removal of the children. Mother continued to reside with maternal grandmother as late as July 2019, after she was informed that doing so was an impediment to the return of the children. Mother's whereabouts were unknown from July 2019 until March 2020. At this time, no alleged address that Mother gave could be verified. Mother then claimed to be staying with her uncle, but refused to provide his address, or any other, at which she claimed to be staying. After the petition was filed, Mother moved to Illinois around October 2020 and stated at trial that she had had a place of her own since February 2021. Ms. Lawson stated that Mother had a lease agreement at her current home in Illinois, but she had not been able to verify the suitability of that home.

Ms. Lawson filed an affidavit of reasonable efforts, in which she outlined the efforts she made to help Mother from October 2018 to March 2020. She stated that it had been difficult to provide these efforts to Mother. She described Mother's overall demeanor as "defensive" and "argumentative," and stated that Mother blamed DCS and others for taking the children from her. She also testified that Mother's conduct made it difficult for her to maintain good contact with Mother. She explained that "when [Mother] wanted services or when we were getting close to court . . . we would talk to her, make those recommendations, but it was not a consistent contact with [DCS] or for us to be able to locate her and make sure that she's following up with those." Mother demonstrated a pattern of contacting DCS right before court.

The proof showed that Mother did not make an effort to foster her relationship with her children, frequently missing visitation and arriving late for approximately 75% of visits or calls. She also failed to submit to several drug screens, failed to arrive on time or appear at all for scheduled appointments, delayed her assessments, and denied that she needed the recommended services. At trial, Mother admitted to shortcomings and expressed remorse, stating that she "could have done so much better." She believed that moving out of state had helped her, but also stated that she would "understand" if her rights were terminated.

Throughout DCS's involvement, it is clear that Ms. Lawson attempted to help Mother establish a suitable home and complete the necessary requirements to ensure that her home would be suitable for the children. However, Mother did not make much, if any, effort to establish a suitable home until after the petition was filed. Instead, she delayed, resisted, and denied the help from DCS and the reality of her situation. The juvenile court noted that Mother had "a very poor track record," "lack[ed] seriousness about this case," "would not accept responsibility for her own actions," and demonstrated "a general indifference" toward this situation. We agree. Although we commend Mother's efforts to obtain a home of her own in Illinois, this did not occur until February 2021. This was seven months after the petition was filed and nearly two-and-a-half years after the children were removed from her custody. Moreover, we have held that a suitable home "requires more than a proper physical living location." *In re Navada N.*, 498 S.W.3d at 595 (citations omitted). At the time of trial, nothing was known about Mother's home, other than her unsubstantiated claims.[7] Based on Mother's unaddressed substance abuse, there are additional concerns of whether her home is drug free.

As such, we find that DCS made reasonable efforts to assist Mother in establishing a suitable home, but Mother did not make reciprocal reasonable efforts and demonstrated a lack of concern for the children to such a degree that it appeared unlikely, at the time of trial, that she would be able to provide a suitable home for the child at an early date. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*c*). We affirm the juvenile court's finding that DCS met

---

[7] Mother presented a copy of the first page of her alleged lease agreement at trial, but did not have the complete document. The document is not a part of the record.

its burden of proof on the ground of abandonment by failure to provide a suitable home.

### 5. Substantial Noncompliance with a Permanency Plan

A parent's rights may be terminated for substantial noncompliance with the statement of responsibilities in a permanency plan. Tenn. Code Ann. § 36-1-113(g)(2). "Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal." *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *7 (Tenn. Ct. App. July 13, 2015) (citing Tenn. Code Ann. § 37-2-403(a)(2)(A)). To establish this ground, the parent's noncompliance with the plan must be substantial, and the plan's requirements must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547. "In the context of the requirements of the permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id*. at 548. Determining whether the parent has sufficiently complied with a permanency plan "involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed and 'going through the motions' does not constitute substantial compliance." *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d at 547).

There were three permanency plans developed throughout DCS's involvement with this family. Despite the multiple plans, Ms. Lawson testified that the plans had the same steps and nothing had changed since she took over the case in October 2018.[8] We reiterate Mother's responsibilities:

1. Submit to random drug screens, only test positive for prescribed medications, inform DCS of prescriptions, and provide medications for pill counts;
2. Complete an A&D assessment and a mental health assessment with a parenting component, provide an honest and truthful report during those assessments, and follow recommendations;
3. Sign releases of information to allow DCS to correspond with providers, communicate with law enforcement and probation officers, and obtain medical and educational records for the children;
4. Obtain a legal source of income, provide proof of that legal income, and complete a budget;
5. Demonstrate knowledge of community resources;
6. Obtain safe and suitable housing, provide proof of payment on rent and utilities, submit to announced and unannounced home visits, and report all persons in the home and any changes in her living arrangements within 48 hours;

---

[8] However, Mother was required to complete new mental health and A&D assessments according to subsequent plans.

7. Attend court hearings, pay all court costs and fines, and comply with any rules of probation or court orders;
8. Settle all legal charges, refrain from acquiring new charges, dissociate with anyone known to be involved in criminal activity, report any new charges within 48 hours, and provide information regarding the new charge and where it occurred;
9. Maintain weekly contact with Ms. Lawson and provide updates on progress toward actions steps; and
10. Provide for the children during visitations and provide 24-hour notice if needing to cancel or reschedule a visit with the children.

Addressing substance abuse was the most important action step, but there was no proof that Mother's substance abuse had been remedied at the time of trial. Mother had not attempted to complete any of the services to address her substance abuse, continued to not follow up with those, and her substance abuse would put the children in danger. Ms. Lawson attempted to discuss the permanency plan with Mother in March 2020, but Mother became argumentative and defensive stating that DCS had taken the children away from her. In April 2020, Ms. Lawson and Mother reviewed the permanency plan and everything that Mother still needed to do, but Mother denied that she needed the recommended services. Ms. Lawson also stated that Mother's counseling with Telehealth did not demonstrate Mother's sobriety because there were no drug screens occurring. Moreover, Mother had problems maintaining contact with Ms. Lawson and demonstrated a pattern of only contacting Ms. Lawson right before court. DCS wanted Mother to show participation and consistency but could not verify Mother's progress when Mother failed to maintain contact with DCS.

When the children were removed and Mother was arrested for child endangerment, she tested positive for methamphetamine, amphetamine, and marijuana. Thereafter, she continued to test positive for illegal substances on drug screens. In addition to her failed drug screen in October 2018, she failed drug screens in January 2019, March 2019, April 2019, and May 2020. Mother also failed to submit to drug screens in December 2018, April 2019, May 2019, April 2020, and March 2021. Mother refused to submit to the drug screen in March 2021 because she had used "Delta-8 CBD," which she stated would cause her to fail for THC. She acknowledged that she understood that it was a necessary requirement on her permanency plan for her to demonstrate sobriety. At the time of trial, Mother testified that she was not using drugs, had been clean since May 2020, and would pass a drug screen if she was given one at that time.

Among other responsibilities, Mother was required to complete assessments, obtain housing and legal income, and refrain from acquiring new charges. Although Mother eventually completed her first A&D assessment, she was court ordered to complete a second A&D assessment after continuing to fail drug screens. She then failed to follow the IOP recommendation and was required to complete a third A&D assessment. At the time of the filing of the petition, she had still not completed an IOP and denied that she

needed it. Mother failed to appear for her scheduled psychological evaluation appointments in March 2019 and April 2019. Mother participated in part of her psychological evaluation in June 2019, but the provider was unable to complete it because Mother had arrived late for the appointment. Mother ultimately completed the psychological evaluation in July 2019 after the staff had to stay late to accommodate her and stay after hours because she arrived late again. Mother claimed that she was now attending counseling and had completed her parenting education. However, counseling was telephonic, which meant that there was no ability for the counselor to administer drug screens to monitor Mother's sobriety. Although DCS requested that Mother complete drug screens in Illinois, Mother failed to do so. Therefore, Mother failed to provide proof of sobriety to demonstrate she had overcome her addiction and proof that her mental health had reached a form of stability to make it safe for the children to be in her home.

Mother obtained and provided proof of housing and a legal income sometime between February and April 2021, after the termination petition was filed in July 2020. She did not provide a budget to DCS until the day of the termination hearing. She was required to refrain from acquiring new criminal charges, but was charged with fraudulent use of a credit card in February 2019, criminal trespass in July 2019, and possession of a schedule II substance and possession of drug paraphernalia in May 2020. She frequently missed or arrived late for a majority of visits or calls, and she discussed inappropriate topics with the children. Additionally, she was required to maintain weekly contact with Ms. Lawson, but disappeared for a period of approximately seven months at one point without any contact.

As we have already discussed, Mother appeared to be remorseful, apologized for her actions, and admitted she could have done better. However, it clear to this Court that Mother was substantially noncompliant with her permanency plan. Mother did make some efforts to comply, but many of those came after the petition was filed. Unfortunately, as we have observed in similar cases, Mother's efforts were "too little, too late." *In re Michael*, No. M2015-02497-COA-R3-PT, 2016 WL 7486361, at *16 (Tenn. Ct. App. Oct. 6, 2016).[9] Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of substantial noncompliance with a permanency plan.

### 6. Persistent Conditions

The sixth ground for termination at issue on appeal is commonly known as "persistent conditions." This ground for termination applies when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered

---

[9] *See In re Daymien T.*, 506 S.W.3d 461, 473 (Tenn. Ct. App. 2016); *In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *6 (Tenn. Ct. App. Feb. 27, 2015); *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003).

at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each element must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. This Court has stated that this ground applies "when, by court order, a 'child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months' as a result of a dependency and neglect petition." *In re Boston G.*, No. M2019-00393-COA-R3-PT, 2020 WL 2070399, at *6 (Tenn. Ct. App. Apr. 29, 2020); *see also In re D.V.*, No. E2018-01438-COA-R3-PT, 2019 WL 1058264, at *5 (Tenn. Ct. App. Mar. 6, 2019) ("The child must have been removed from the home or the physical or legal custody of a parent/guardian for a period of six (6) months by a court order entered following a petition alleging that the child is a dependent and neglected child."). "The necessary order of removal is 'the threshold consideration' for this ground." *In re Lucas S.*, No. M2019-01969-COA-R3-PT, 2021 WL 710841, at *4 (Tenn. Ct. App. Feb. 24, 2021) (quoting *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015)).

In October 2018, the juvenile court entered a protective custody order finding that there was probable cause to believe that the children were dependent and neglected, and immediately placing the children in the protective custody of DCS. The children were removed from Mother's custody on October 18, 2018, after she was arrested for child endangerment. Additionally, Mother tested positive for methamphetamine, amphetamine, and marijuana. Thereafter, DCS filed a petition to declare the children dependent and neglected. On April 3, 2019, the juvenile court entered an adjudicatory and dispositional hearing order finding that the children were dependent and neglected. DCS then filed its petition to terminate Mother's parental rights in July 2020. As such, the children were

removed from Mother's custody for more than the six-month period required by the statute, which accrued well before the first date the termination of parental rights petition was set to be heard. Tenn. Code Ann. § 36-1-113(g)(3).

As stated before, the most important aspect of this case was the issue of Mother's substance abuse. As we have previously discussed, Mother failed several drug screens and failed to submit to several drug screens. At the time of the filing of the petition, Mother had not completed her IOP and had failed to demonstrate substantial sobriety. Ms. Lawson had requested a drug screen two weeks prior to trial, which would have verified whether Mother had maintained a long period of sobriety, but Mother refused. At trial, which was nine months after the filing of the petition for termination, Ms. Lawson did not have any proof of Mother's sobriety or proof that Mother had remedied her substance abuse. Mother testified that she had not used drugs since May 2020, and would pass a drug screen if she were given one at the time of trial. She acknowledged that she understood that drug screens were a necessary requirement on her permanency plan in order to demonstrate sobriety, which had been in place since November 2018.

Mother's criminal activity was another condition that existed at the time of removal, as she was arrested for child endangerment. After removal in October 2018, she was required to refrain from acquiring new criminal charges. However, she was charged with: fraudulent use of a credit card in February 2019; criminal trespass in July 2019; and possession of a schedule II substance and possession of drug paraphernalia in May 2020. Mother's continued engagement in criminal activity demonstrated that the conditions at the time of removal persisted. Mother had ample opportunity to address these conditions and avoid repeating the same mistakes, but failed to do so.

Ms. Allen stated that the children had made "extreme progress" in their counseling with her. She testified that there was currently no evidence demonstrating that the children were attached to Mother, but that they were attached to their foster parents. She described the children's behavior during discussion about Mother as "very flat." She explained that "there's really nothing there" and the children "kind of go blank." Ms. Allen testified that the children seem happy and stable in their current environment. She also stated that the children were trauma-exposed and believed that changing the current caregiver would likely have a detrimental effect on the wellbeing of the children. She explained that it would retraumatize, break all attachments that they had formed, and cause acting out behaviors to reoccur. As such, she concluded that the best avenue for the wellbeing of the children would be to obtain permanency through adoption.

For the foregoing reasons, we find that the conditions that led to the children's removal persisted and that there was little likelihood that these conditions would be remedied at an early date so that the children could be returned to Mother in the near future. Furthermore, continuation of the parent-child relationship would have greatly diminished the children's early integration into a safe, stable, and permanent home. Therefore, we

affirm the juvenile court's conclusion that DCS met its burden of proof on the ground of persistent conditions.

### 7. Failure to Manifest an Ability & Willingness to Assume Custody

Another ground for termination exists when "[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). Under this statutory ground, there are two elements necessary to prove. *In re Neveah M.*, 614 S.W.3d at 674. The first element "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Accordingly, "clear and convincing proof that a parent . . . has failed to manifest <u>either</u> ability or willingness" satisfies the first element of this ground. *Id.* (adopting *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). A parent's ability to assume custody or financial responsibility is evaluated based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (citing *In re Ayden S.*, 2018 WL 2447044, at *7). It is common for parents to state that they are willing to assume custody or financial responsibility for their children. However, as we have explained, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). The second element requires the petitioner to establish that "placing the child in the [parent's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14); *see In re Neveah M.*, 614 S.W.3d at 677.

Mother's children were removed from her custody in October 2018. Almost two years later, Mother did not have the ability to assume custody of the children when the petition for termination was filed. Mother did not have a suitable home of her own at the time and had yet to properly address her substance abuse. Mother had ample time, but failed to establish a safe, stable, and drug-free home. Moreover, Mother demonstrated that she was unable to financially support her children at that time by failing to obtain employment, provide verification of employment, and pay child support. At one point, Mother disappeared for a period of approximately seven months without any contact, which demonstrated a lack of seriousness and an indifference toward the reality of her situation. While Mother may have loved her children, Mother did not make the effort in this two-and-a-half-year case to demonstrate that.

Additionally, the record demonstrates that placing the children in Mother's custody would pose a risk of substantial harm to the physical or psychological welfare of the children. There was no proof of Mother's sobriety both at the time the petition was filed

and at the time of trial. Mother continued to test positive for illegal substances throughout DCS's involvement with this family. Furthermore, Mother demonstrated a pattern of criminal activity with multiple arrests. For these reasons, we agree that returning the children to Mother would pose a risk of substantial harm to the welfare of the children.

Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of failure to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the children.

## B. *Best Interests of the Children*

We now review whether termination of Mother's parental rights was in the best interests of the children. This Court "must consider nine statutory factors listed in Tennessee Code Annotated § 36-1-113(i)." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). "The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878. We view the children's best interests from the children's perspective rather than the parents' perspective. *Id.* Finally, we "must consider all of the statutory factors, as well as any other relevant proof any party offers." *In re Gabriella D.*, 531 S.W.3d at 682. However, "a finding on each factor is not required." *In re Kaylene J.,* No. E2019-02122-COA-R3-PT, 2021 WL 2135954, at *18 (Tenn. Ct. App. May 26, 2021); *see In re Matthew T.*, 2016 WL 1621076, at *16 (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)).

The first statutory factor is "[w]hether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian[.]" Tenn. Code Ann. § 36-1-113(i)(1). Ms. Lawson testified that she did not see any sort of change or adjustment of circumstances in Mother's life to make it safe for the children to return home. Mother's telephonic counseling did not demonstrate an adjustment of circumstances on sobriety because there were no drug screens occurring. While Mother had testified that she was not using drugs at the time of trial and had been clean since May 2020, she refused to submit to a drug screen two weeks prior. Mother also continued to acquire new charges throughout DCS's involvement with this family, demonstrating an inability to adjust her conduct. As such, we find this factor weighs in favor of termination.

The second statutory factor is "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible[.]" Tenn. Code Ann. § 36-1-113(i)(2). From the time of the children's removal in October 2018 until the petition was filed in July 2020, Mother had nearly two years to effect a lasting adjustment. Mother continued to test positive for illegal substances, acquire new charges, failed to obtain

housing and provide proof, and failed to obtain employment and provide proof. Although Mother appeared to have made some progress after the petition was filed, she had "a very poor track record," "lack[ed] seriousness about this case," "would not accept responsibility for her own actions," and demonstrated "a general indifference" toward her situation. Not until the petition was filed did Mother finally begin to take her situation seriously and attempt to effect an adjustment in her life. Unfortunately, in this Court's view, Mother's efforts to effect an adjustment came too late. We find that this factor weighs in favor of termination.

The third statutory factor is "[w]hether the parent . . . has maintained regular visitation or other contact with the child[.]" Tenn. Code Ann. § 36-1-113(i)(3). Mother's tardiness for visitation was an issue. In addition to missing scheduled visits or calls, Mother was late for approximately 75% of visits or calls, which upset the children. Furthermore, Mother had not visited with the children since June 2019, due to Mother's behavior that led to the restraining order being put in place by the court. We find that this factor weighs in favor of termination.

The fourth statutory factor is "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child[.]" Tenn. Code Ann. § 36-1-113(i)(4). Ms. Lawson testified that Mother had not maintained any sort of regular visitation with the children, there was not a meaningful relationship, and Mother had not seen the children in more than two years. Additionally, the children did not ask about Mother and referred to their foster parents as their parents. Ms. Allen testified that there was currently no evidence demonstrating that the children were attached to Mother. She described the children's behavior during discussion about Mother as "very flat" and explained that "there's really nothing there" and the children "kind of go blank." Given this testimony, we find that this factor weighs in favor of termination.

The fifth statutory factor is "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition[.]" Tenn. Code Ann. § 36-1-113(i)(5). Ms. Allen testified that the children were trauma-exposed and believed that changing the current caregiver would likely have a detrimental effect on their wellbeing. She explained that it would retraumatize the children, break all attachments that they had formed, and cause acting out behaviors to reoccur. The proof shows that the children are attached to their foster parents. We find that this factor weighs in favor of termination.

The sixth statutory factor is "[w]hether the parent . . . , or other person residing with the parent . . . , has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child[ren], or another child or adult in the family or household[.]" Tenn. Code Ann. § 36-1-113(i)(6). In her psychological evaluation, Mother stated that she had been a victim of domestic violence, some of which Jayce had witnessed. Additionally, when the children were removed from her custody, they were wearing dirty clothes,

smelled as though they had not bathed in quite some time, and Jayce appeared to be malnourished. The children also reported that they had been sleeping in a vehicle at that time. We find that this factor weighs in favor of termination.

The seventh statutory factor is "[w]hether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent . . . consistently unable to care for the child in a safe and stable manner[.]" Tenn. Code Ann. § 36-1-113(i)(7). Mother failed to provide proof of sobriety to demonstrate she had overcome her addiction and proof that her mental health had reached a form of stability to make it safe for the children to be in her home. DCS was also concerned about the physical environment of Mother's home at the time the petition was filed because DCS did not know or have verification of where she was. Mother had a home in Illinois, which was obtained after the petition was filed, but DCS had not been able to verify the suitability of that home. We find that this factor weighs in favor of termination.

The eighth statutory factor is "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child[ren] or prevent the parent . . . from effectively providing safe and stable care and supervision for the child[.]" Tenn. Code Ann. § 36-1-113(i)(8). Again, Mother failed to provide proof of sobriety to demonstrate she had overcome her addiction and proof that her mental health issues had been addressed. Mother exhibited several "red flags" throughout DCS's involvement. In April 2019, Mother and the maternal grandmother stalked and harassed the foster parents and attempted to take the children. In August 2019, the foster parents stated that they had concerns about Mother's mental state. At that time, Mother was unable to be located and disappeared for a seven-month period. In April 2020, Mother called Ms. Lawson "very upset" and left a message threatening to "come hunt the kids down like she had before." We find that this factor weighs in favor of termination.

The ninth statutory factor is "[w]hether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101." Tenn. Code Ann. § 36-1-113(i)(9). Mother did not pay any child support or provide necessities for the children prior to the filing of the petition in July 2020. Mother was ordered to pay child support by the juvenile court and was aware of her duty to support her children, but had not provided any justifiable excuse for not being able to support the children. The proof shows that Mother was employed from August 2020 through April 2021. Mother testified that child support had been garnished out of her paycheck, her tax return, and her stimulus checks. However, she explained that she did not pay child support in the past because she did not have a job, did not have transportation, and "things were really hard." We find that this factor weighs in favor of termination.

In conclusion, we note that Mother argues, among other things, that the juvenile court failed to consider that Mother had obtained stable housing and employment; had completed requirements on her permanency plan such as her parenting education, psychological evaluation, A&D assessment, and budget; had paid child support for her children; and was receiving counseling. We reiterate that many of these alleged steps were only completed after the petition was filed, or on the eve of the final termination hearing, if at all. As we have previously stated, "[w]e have considered those facts, and commend Mother for her efforts, but nevertheless find the evidence clear and convincing that termination of Mother's parental rights is in the best interest of the children." *In re Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *20 (Tenn. Ct. App. Nov. 6, 2020).

## V.    CONCLUSION

For the aforementioned reasons, we reverse the finding that DCS proved by clear and convincing evidence that Mother's parental rights should be terminated due to abandonment by failure to visit. However, we affirm the ultimate termination of parental rights. Costs of this appeal are taxed to the appellant, Tanya L. E., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE